**HAGERMAN CONSTRUCTION, INC., Appellant–Defendant,**

v.

**Theresa COPELAND in her capacity as Administrator of the Estate of Anthony G. Copeland, Appellee–Plaintiff,**

**Crown–Corr, Inc., Appellee–Defendant.**

No. 18A04–9612–CV–519.

Court of Appeals of Indiana.

June 25, 1998.

Opinion on Rehearing Oct. 6, 1998.

W. Brent Threlkeld, Rocap, Witchger & Threlkeld, Indianapolis, for Appellant–Defendant.

Steven D. Murphy, DeFur, Voran, Hanley, Radcliff & Reed, Muncie, James S. Savage, McFadden, Winner and Savage, Columbus, Ohio, for Appellee–Plaintiff Theresa Y. Copeland.

Mary K. Reeder, Sharon A. Luarde, R. Jay Taylor, Riley Bennett & Egloff, Indianapolis, for Appellee–Defendant Crown–Corr, Inc.

## OPINION

RATLIFF, Senior Judge.

### Case Summary [1]

Appellant–Defendant, Hagerman Construction, Inc. ("Hagerman"), appeals the jury's award of $4,750.000.00 to Teresa Copeland ("Copeland"), administratrix of the estate of her husband Anthony Copeland ("Anthony"), on her claim for Anthony's wrongful death. Hagerman also appeals the jury's finding that its subcontractor Crown–Corr, Inc. was not at fault. We affirm in part and remand in part.

### Issues

Hagerman raises thirteen issues for our review which we restate as:

I. Whether the trial court properly excluded the deposition of Copeland's expert witness, who was unavailable for trial;

II. Whether the trial court properly admitted evidence of subsequent remedial measures by Hagerman;

III. Whether the trial court properly excluded evidence that Hagerman had not violated regulations of the Indiana Department of Labor/OSHA ("IOSHA"), and excluded evidence that Hagerman's subcontractor, John F. Beasley Construction Co. ("Beasley"), had violated IOSHA regulations;

IV. Whether the trial court properly excluded evidence of Anthony's blood alcohol content;

---

1. We herewith deny Hagerman's petition for oral argument.

V. Whether the trial court properly admitted evidence of construction industry custom and practice regarding the meaning of contract terms;

VI. Whether the trial court properly excluded evidence of collateral source payments received by Copeland;

VII. Whether the trial court properly refused Hagerman's tendered jury instruction regarding judicial notice of prior orders;

VIII. Whether the trial court properly instructed the jury on the sudden emergency doctrine;

IX. Whether the trial court properly instructed the jury regarding responsibility for safety;

X. Whether the trial court properly instructed the jury regarding Crown–Corr's obligation to indemnify Hagerman;

XI. Whether the trial court properly denied Hagerman's motion for summary judgment on its cross-claim for indemnification from Crown–Corr;

XII. Whether the trial court properly denied Hagerman's motion for set-off, requesting a credit against the judgment in the amount of Copeland's settlement with Sater Electric, Inc.; and,

XIII. Whether the trial court properly refused to find the jury's damage award excessive.

### Facts and Procedural History

The facts most favorable to the verdict show that in 1990, Ball State University contracted with Hagerman and Sater Electric Co. ("Sater") for the construction of a new basketball arena. Hagerman was a prime contractor responsible for general construction, and Sater was a prime contractor responsible for mechanical and electrical construction. On April 24, 1991, Anthony, an experienced ironworker employed by Beasley, a subcontractor of Hagerman, fell to his death through an unprotected opening in the precast concrete nearly forty-five feet above the ground. The opening was to allow for vertical heating and cooling ductwork to be installed by Sater. The precast concrete was manufactured by Concrete Technology, Inc.

("CTI"), also a subcontractor of Hagerman and was installed by Pre–Cast Services, Inc., a subcontractor of CTI. At the time of the accident, Crown–Corr was installing sheet metal siding in the vicinity of the opening.

The opening through which Anthony fell was one of many openings on the upper level of the arena which had gone unprotected for a considerable time. On March 29, 1991, Crown–Corr, preparing to begin its work, requested that Hagerman cover the openings before it would begin. Because Hagerman had told all its subcontractors to provide such safety measures themselves if they were concerned, it initially refused, but proceeded to cover the openings nonetheless. Although the evidence was conflicting regarding whether all the openings were ever covered, the opening into which Anthony fell was covered at some point prior to the accident. The evidence was also conflicting regarding who uncovered that particular opening and when. Before the accident, Sater was also in the vicinity doing minor electrical work and taking measurements in preparation of installing the vertical ductwork through the openings.

When Anthony fell through the opening, he first landed face down on a concrete beam fifteen to eighteen feet below. There was testimony that although he appeared to be severely injured, Anthony stood up, tried to move along the beam, then crouched down before slipping off and falling the rest of the way to the ground. Anthony was twenty-nine years of age and was survived by a wife and two young sons.

On August 3, 1992, Copeland filed her complaint for wrongful death against Hagerman, CTI and Pre–Cast Services, Inc. Hagerman filed a cross-claim for indemnity against CTI and CTI filed a cross-claim against Pre–Cast Services, Inc. Summary judgment was later granted in favor of CTI and Pre–Cast Services, Inc. and both were dismissed from the suit. Crown–Corr and Sater were named nonparties and then joined in the suit. Hagerman initiated a third-party action against Beasley, which was severed for later trial. Sater and Crown–Corr both filed motions for summary judgment which the trial court denied. Hager-

man also filed a cross-claim for indemnification against Crown–Corr. Copeland settled with and dismissed Sater prior to trial, and Sater was designated a nonparty.

Following a four day trial, the jury found that Hagerman was one hundred percent at fault for Anthony's death, assigned no fault to either Sater or Crown–Corr, and found for Crown–Corr on Hagerman's cross-claim for indemnification. The jury awarded Copeland $4,750,000.00 in damages. Hagerman's motion to correct errors was denied as was Hagerman's motion for set-off of the amount of Sater's settlement with Copeland. Hagerman now appeals the trial court's entry of judgment.

### Discussion and Decision

#### I. Hasse Deposition

Hagerman argues that the trial court erred in excluding from evidence the deposition of Copeland's expert witness, Quentin Hasse ("Hasse"), who was not present to testify. Hagerman contends that the deposition was admissible under either Ind.Trial Rule 32(A)(3) or Ind.Evidence Rule 804(b)(1). The trial court excluded the deposition "based upon [Evid.R. 403], as far as unfair prejudice, the matter would lead [sic] to confuse the jury in my opinion, and I'm not sure that Crown did have a similar motive at the time of cross examination." (R. 6759).

The admission or exclusion of a deposition is within the sound discretion of the trial court. *LKI Holdings, Inc. v. Tyner*, 658 N.E.2d 111, 116 (Ind.Ct.App.1995), *trans. denied*. We will reverse the trial court only if we determine that an abuse of discretion occurred. *Kellems v. State*, 651 N.E.2d 326, 328 (Ind.Ct.App.1995). Indiana Trial Rule 32 governs the use of depositions at trial: "At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were present and testifying, may be used against any party who was present or represented at

the taking of the deposition ..."[2] T.R. 32(A). Both Copeland and Crown–Corr were represented by counsel during the taking of Hasse's deposition. Thus, the deposition was admissible under T.R. 32(A).

Hasse's deposition is hearsay if offered for the truth of the assertions contained therein. Nevertheless,

[t]estimony given as a witness ... in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination [is not excluded by the hearsay rule if the declarant is unavailable as a witness].

Evid.R. 804(b)(1). The trial court found that Crown–Corr did not have a similar motive to cross examine Hasse, apparently in response to Crown–Corr's argument that Hasse's deposition was a discovery deposition, not a trial deposition. The Indiana Rules of Trial Procedure do not recognize such a distinction.[3] Our review of the Hasse deposition, admitted pursuant to Hagerman's offer to prove, indicates that Crown–Corr extensively cross-examined the deponent. Although Crown–Corr may have anticipated that Hasse would testify at trial and be subject to further cross-examination, we do not discern that its motive during the taking of Hasse's deposition was any different. The questioning focused on which party was responsible for the opening through which Anthony fell: Hagerman, Sater, or Crown–Corr. We conclude that the deposition was admissible under Evid.R. 804(b)(1).

The trial court, however, excluded the deposition because it found that there was a danger of unfair prejudice or confusion of the jury. Statements that are admissible under one rule may be excluded by another. Evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

---

2. "The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: ... (b) that the witness is outside the state." T.R. 32(A)(3). The parties do not dispute on appeal that Hasse, a resident of Illinois, was outside the state.

3. *Cf. Osborne v. Wenger*, 572 N.E.2d 1343, 1345 (Ind.Ct.App.1991) (discussing waiver of objections during depositions taken for trial or for discovery purposes).

misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403. Although we are inclined to agree that the proffered deposition was confusing, we choose not to speculate on the reasoning behind the trial court's ruling. Even if there was error, "[a]ny error in the admission of evidence is harmless if the same or similar evidence is submitted without objection." *Homehealth, Inc. v. Northern Indiana Pub. Serv. Co.*, 600 N.E.2d 970, 974 (Ind.Ct.App.1992).

■ Hagerman contends that Hasse's testimony was not cumulative in two areas: 1) only Hasse testified that Sater's responsibility for safety arose on the day the openings in the precast concrete were created; and 2) only Hasse testified that Crown–Corr had a duty to not create a hazard to *other* employees. However, Morley Brickman, Hagerman's expert witness, testified that Sater's responsibilities occurred from "the start of their work on the job." (R. 7589). Because Sater was working on the project prior to the installation of the precast concrete, the distinction between Sater's responsibility when the precast concrete was erected and when Sater started their work is immaterial. Brickman also testified regarding Sater's responsibility: "I don't think, the responsibility [to check that the openings are covered] is solely Hagerman's.... To say that one [prime contractor] has a greater responsibility than the other, you cannot." (R. 7584).

Regarding Crown–Corr, Brickman stated his opinion that Crown–Corr had a responsibility "not to create a condition and leave it without informing Hagerman or doing something positive to protect it, to not allow that created hazard to continue." (R. 7579). In addition, J. Robert Taylor, Copeland's expert witness, testified that Crown–Corr may have a responsibility to provide safety measures to another subcontractor "if they created an unsafe condition and walked away from it." (R. 5888–89). We conclude that the substance of the Hasse deposition was the same or similar to other evidence and was cumulative. Hagerman was not prejudiced by the trial court's exclusion of the deposition.

*II. Subsequent Remedial Measures*

■ Hagerman argues that the trial court erred in admitting evidence that immediately following the accident, Hagerman's employees installed covers for all openings, including the one through which Anthony fell. Evidence of remedial conduct subsequent to the happening of an accident is generally inadmissible. *Dukett v. Mausness*, 546 N.E.2d 1292, 1293 (Ind.Ct.App.1989), *trans. denied.* Indiana Evidence Rule 407 provides:

> When after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

The rule specifically authorizes the admission of evidence of a subsequent remedial measure when offered for a purpose other than proving negligence. *Utley v. Healy*, 663 N.E.2d 229, 238 (Ind.Ct.App.1996), *trans. denied.* Copeland and Crown–Corr contend that the evidence is admissible to show that Hagerman, not Sater or Crown–Corr, had control of the area on the day of the accident.

■ We need not decide this issue, however. It is well settled that error in admitting evidence at the trial is not available on appeal where the complaining party submits evidence to substantially the same effect. *City of Lake Station v. Rogers*, 500 N.E.2d 235, 239 (Ind.Ct.App.1986). During the presentation of its defense, Hagerman read into evidence the deposition of ironworker William Tomich. The following statements were read before the jury:

Q. [Counsel for Hagerman]. After the accident were the holes covered?

A. [Tomich]. Yes.

Q. Do you know who covered them?

A. I believe, I'm not sure, but I think it was Hagerman.

(R. 7415). Because this testimony was not offered to rebut or explain improperly admitted evidence, *see Leuck v. Goetz*, 151 Ind. App. 528, 280 N.E.2d 847 (1972), Hagerman cannot now claim error in the admission of such evidence.

### III. IOSHA Citations and Reports

Hagerman contends that the trial court erred by excluding evidence of "the terms of Beasley's settlement with IOSHA, the citations of alleged safety violations that led to the settlement, and the IOSHA investigative reports." (R. 3645). Hagerman also argues that the trial court should have admitted evidence that Beasley violated OSHA regulations and that Hagerman did not violate OSHA regulations.[4] Copeland and Crown-Corr assert that this evidence is hearsay, irrelevant and inadmissible.

Following the accident, representatives of IOSHA conducted work site inspections for several days. Hagerman's offer to prove contains inspection reports and worksheets regarding both Hagerman and Beasley. As a result of the inspections, IOSHA issued several safety orders to Beasley concerning "violations alleged to have occurred" and penalties of $70,000.00. (R. 6117–21). These safety orders included violations related to Anthony's fall. The worksheets from which the safety orders were derived contain visual observations of project conditions and most contain statements made by employees of various contractors.[5]

Because these materials were offered by Hagerman for the truth of their contents, in the absence at trial of those who prepared the documents, they constitute hearsay. However,

[R]ecords, reports, statements, or data compilations in any form, of a public office or agency, setting forth ... matters observed pursuant to duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law [are not excluded by the hearsay rule].

Evid.R. 803(8). The IOSHA worksheets and safety orders concern matters observed by inspectors who had a duty to report, and do contain factual findings resulting from a lawful investigation.

Nevertheless, Evid.R. 803(8) does "exclude some statements from its exception to the hearsay rule." *Ealy v. State*, 685 N.E.2d 1047 (Ind.1997). "The following are not within this exception to the hearsay rule: ... (d) factual findings resulting from special investigation of a particular complaint, case, or incident." Evid.R. 803(8). This provision addresses precisely the situation here. Following a particular incident, representatives of IOSHA visited the project site and conducted an in-depth investigation lasting several days. Hagerman does not contend that the documents do not contain "factual findings." A record or report which contains no factual findings "could be simple listings, or a simple recordation of numbers, and the like." *Ealy*, 685 N.E.2d at 1054. Such is not the case here. The IOSHA worksheets and safety orders include detailed evaluations of project conditions relative to various safety regulations, and even attempt to reconstruct how the accident occurred. We conclude that the IOSHA worksheets and safety orders are not admissible pursuant to Evid.R. 803(8)(d), and that the trial court did not abuse its discretion in so deciding.[6]

---

4. Hagerman was cited for safety violations not directly related to the opening through which Anthony fell. The IOSHA safety orders and penalties were settled by Hagerman for a reduced penalty. (R. 6075–81).

5. Hagerman did not offer redacted copies of the IOSHA documents. Because we rely upon Evid.R. 803(8), we do not address Evid.R. 805 regarding hearsay within hearsay.

6. Our supreme court has stated that a court "must determine whether the report was prepared for advocacy purposes or in anticipation of

litigation" when determining "whether a piece of evidence is inadmissible" under Evid.R. 803(8)(c). Subsection (c) prohibits "factual findings offered by the government in criminal cases." *Ealy*, 685 N.E.2d at 1054. Another panel of this court, in a case involving Evid.R. 803(8), recently opined that "the reasoning used to develop this three step evaluation [in *Ealy*] applies to subsections (a) through (d)." *Shepherd v. State*, 690 N.E.2d 318, 326 n. 2 (Ind.Ct. App.1997), *trans. denied.* Because *Shepherd* did not reach Evid.R. 803(8)(d), we decline to follow this observation here. Accordingly, we need not

Hagerman also argues that the trial court erred in excluding evidence of Beasley's settlement with IOSHA. Generally, evidence of "compromising or attempting to compromise a claim . . . is not admissible to prove liability." Evid.R. 408. Hagerman contends that because Beasley was not a party at trial, the rule excluding offers of compromise does not apply. Although we do not decide that such evidence is admissible when offered against one who is not a party, we note that Beasley is involved in this lawsuit. Hagerman's third-party complaint against Beasley was separated for later trial. The trial court's order separating trial stated: "The evidence presented in the trial on the Copeland Complaint shall be incorporated in any trial that may occur on Hagerman's Third–Party Complaint against Beasley so as to relieve Hagerman from presenting the same evidence at any subsequent trial." (R. 1728). Any evidence admitted here would be admitted against Beasley. Hagerman also asserts that Evid.R. 408 only excludes evidence offered on the underlying claim. Again, without deciding the truth of this assertion, we note that Hagerman offered the evidence to prove the claim underlying the settlement, that Beasley violated IOSHA safety regulations. The trial court did not abuse its discretion in excluding evidence of Beasley's settlement with IOSHA.

The trial court also excluded witness testimony at trial that Beasley, but not Hagerman had violated IOSHA safety regulations. This testimony was not covered by the motion or order in limine, but the trial court apparently expanded the order to cover IOSHA compliance generally. Hagerman argues that the trial court abused its discretion in excluding this testimony, but allowing other testimony that Hagerman had violated IOSHA regulations.

Copeland's opening and closing arguments at trial mentioned IOSHA regulations and there was testimony regarding the content of these regulations.[7] Contrary to Hagerman's assertion, there was no testimony that Hagerman was found to be in violation of IOSHA regulations. J. Robert Taylor, deputy coroner and architect, testified that, in order to comply with IOSHA, Hagerman could have either covered the openings or barricaded them. (R. 5864). If Hagerman considered this testimony to be a statement that Hagerman violated IOSHA regulations, contrary to the order in limine, it should have objected at trial.

The trial court excluded testimony from the county coroner that he told Beasley, not Hagerman, to get in compliance with IOSHA; from Taylor that he was not aware of any IOSHA violations; and from Randall Horstman, Hagerman CFO, that Hagerman was not cited by IOSHA for any conditions related to the accident. Having excluded the actual IOSHA worksheets and safety orders from evidence, it was not unreasonable for the trial court to exclude opinion testimony about such violations. The trial court did not abuse its discretion in excluding this evidence.

## IV. Blood Test Evidence

Hagerman argues that the trial court erred in excluding evidence of Anthony's blood alcohol content from a sample taken at the time of the autopsy.[8] Copeland contends that because the blood sample was not frozen, no preservatives were added, and the blood test was not done until sixteen months later, the results are unreliable. Hagerman counters that the evidence proffered by both parties was attested to by qualified expert witnesses and the jury should have been allowed to weigh the conflicting testimony.

Our evidence rules provide that "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Evid.R. 702(b). In addition, "[e]xperts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." Evid.R. 703. Thus, the results

---

determine whether the IOSHA records were prepared for advocacy purposes or in anticipation of litigation.

7. 29 C.F.R. § 1926.500.

8. The test results indicated a 0.02 percent blood alcohol content.

of the blood test here is admissible only if the scientific principles upon which the test depends are reliable and the evidence is of the type reasonably relied upon by experts in the field. This reliability requirement "recognizes the role of the trial court as 'gatekeeper' concerning the admission of expert scientific testimony." *Weinberg v. Geary,* 686 N.E.2d 1298, 1301 (Ind.Ct.App.1997). The proponent of the scientific evidence has the burden to prove the reliability of the scientific test. *McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997). The decision of the trial court as to reliability will be reviewed for abuse of discretion. *Id.*

Initially, we note that the parties do not dispute the reliability of blood testing generally, or whether the proper procedures were utilized in performing the test itself. The argument focuses on the reliability of the test when performed on an unfrozen, unpreserved blood sample. Hagerman cites *Hayes v. State,* 514 N.E.2d 332 (Ind.Ct.App.1987), *trans. denied,* where evidence of a blood test performed several hours after the unrefrigerated sample was taken (indicating a serum alcohol level of 0.254) was held admissible. In *Hayes,* because the sample had clotted, the technician was unable to determine the whole blood alcohol level but was able to test the serum alcohol level. The *Hayes* court concluded that the "fact that a scientific test is subject to error if not properly conducted is not a reason for rejecting the evidence adduced by such a test." *Id.* at 338. In *Hayes,* we held that the persuasiveness of the test was to be determined by the jury. *Id.*

Like the test in *Hayes,* the test performed on Anthony's blood was of the serum alcohol level. However, in an affidavit, the assistant supervisor of the laboratory which performed the test on Anthony's blood stated that "[w]henever our laboratory receives blood for later testing, we freeze it to preserve it so it can be *reliably* tested later." (R. 3381) (emphasis added). Through no fault of the laboratory, this protocol was not followed. Blood stored for sixteen months unfrozen and un-

preserved raises more than a possibility of error upon testing, and is not a minor irregularity in procedure as addressed in *Hayes.* While any scientific test is subject to error, *Hayes* cannot extend so far that evidence becomes admissible where even the laboratory conducting the test provides testimony questioning the test's reliability.

Hagerman also cites *Hopkins v. State,* 579 N.E.2d 1297 (Ind.1991), for the proposition that a "battle of qualified experts ... or other conflict as to the reliability of evidence is to be resolved by the trier of fact." *Id.* at 1303. However, our supreme court has recently clarified *Hopkins* on this point. In *Harrison v. State,* 644 N.E.2d 1243 (Ind. 1995), the court reiterated the above proposition from *Hopkins,* but emphasized that qualification of expert witnesses and the reliability of scientific principles underlying the testimony are threshold questions for the court. "Expert scientific testimony is admissible in Indiana only if the *court* is satisfied that the scientific principles upon which the expert testimony rests are reliable." [9] *Id.* at 1251.

■ In determining whether "the scientific principles upon which the expert testimony rests are reliable," Evid.R. 702(b), the trial court may look to whether the proffered evidence is of a "type reasonably relied upon by experts in the field." Evid.R. 703. Copeland presented expert testimony that it would be "impossible to assign any degree of reliability to the test for blood alcohol level," (r. 3382), and that the test results "obtained on such blood are completely unreliable." (R. 3384). Given the testimony that other experts in the field would not rely upon this evidence, we cannot say that the trial court abused its discretion in excluding it.

### V. Evidence of Industry Custom and Practice

■ Hagerman argues that the trial court erred in admitting testimony regarding construction industry custom and practice and expert testimony regarding the meaning of various contract terms. Hagerman as-

---

9. *Cf. Hopkins,* 579 N.E.2d at 1305 (Dickson, J., concurring) (observing that our supreme court had previously "rejected a *court-determined* relia-

bility factor as a prerequisite to the admissibility of expert opinion") (emphasis added).

serts that such extrinsic evidence is only admissible where the contract is ambiguous. This is not, however, a breach of contract case. In a contract for work, there is an implied duty to do the work skillfully, carefully, and in a workmanlike manner. *St. Paul Fire & Marine Ins. Co. v. Pearson Constr. Co.,* 547 N.E.2d 853, 857 (Ind.Ct.App. 1989), *trans. denied.* Negligent failure to do so is a tort, as well as a breach of contract. *Id.*

The evidence to which Hagerman objects consisted of two expert witnesses and three construction workers. The two expert witnesses testified regarding Hagerman's contractual responsibility for safety, as well as custom and practice in the construction industry concerning the covering of openings. The three construction workers testified regarding other projects and that the general contractor typically covers openings. Hagerman contends that evidence regarding other projects is irrelevant and unfairly prejudicial. Copeland argues that the evidence is relevant because Hagerman's contract incorporates custom and practice: "The General Construction Contract includes ... other activities traditionally recognized as general construction." (R. 4462).

 The conduct of other persons in substantially similar conditions may be relevant to the reasonableness, under the circumstances, of a particular individual's acts or omissions. *Walters v. Kellam and Foley,* 172 Ind.App. 207, 360 N.E.2d 199, 214 (1977). It is therefore proper to receive evidence of others' conduct from which the jury may determine that the conduct under consideration was or was not reasonable in light of all the circumstances. *Id.* The evidence objected to here was relevant to establish the standard of care which accompanied Hagerman's contractual duty of safety. The trial court did not err in admitting such testimony.[10]

## VI. Evidence of Collateral Source Payments

Hagerman argues that the trial court erred in excluding evidence of payments re-

ceived by Copeland's survivors following Anthony's death. Anthony's spouse received annuity and life insurance payments from his union, weekly payments from the Ohio Industrial Commission, and other life insurance proceeds. The payments from the industrial commission are identified as "death benefits." (R. 2778). The annuity payments are identified as a "preretirement survivor annuity," apparently from Anthony's union retirement account. (R. 2776). Hagerman also claims that evidence of Social Security payments was wrongfully excluded.

Evidence of collateral source payments is admissible to prevent a prevailing party in a personal injury or wrongful death action from recovering more than once from all applicable sources. *See* Ind.Code § 34-4-36-1. Proof of such payments is admissible with three exceptions:

(A) payments of life insurance or other death benefits;

(B) insurance benefits for which the plaintiff ... paid for directly; or

(C) payments made by the state or the United States ... that have been made before trial to a plaintiff as compensation for the loss or injury for which the action is brought;

Ind.Code § 34-4-36-2(1).

 The life insurance payments, the industrial commission death benefits, and any Social Security payments are clearly excluded by statute. *See Town of Highland v. Zerkel,* 659 N.E.2d 1113, 1117 (Ind.Ct.App. 1995), *trans. denied.* It is unclear, however, whether the annuity payments were a result of an employer provided benefit, or were paid for directly by Anthony. This court recently held that "[a]bsent a showing that neither [the injured party] nor her husband paid for her benefits directly, we cannot say that the trial court abused its discretion in excluding the evidence." *Id.* Here, there is no evidence that Anthony did not pay for this benefit directly, either by payroll deduction or by reason of his labor.[11]

---

**10.** We do not address whether the testimony was admissible under either Evid.R. 701 or 702(a).

**11.** *Cf. Id.* at 1123 (Kirsch, J., concurring in result) (stating that payment for collateral source

### VII. *Judicial Notice Instruction*

 Hagerman next challenges several decisions of the trial court in instructing the jury. The decision to give or deny a tendered jury instruction is largely left to the sound discretion of the trial court. *Taylor v. State*, 629 N.E.2d 852, 855 (Ind.Ct.App.1994). We review the trial court's decision only for abuse of that discretion. *Id.* In evaluating whether a trial court erroneously refused a tendered instruction, we consider (1) whether the tendered instruction correctly states the law, (2) whether there is evidence in the record to support giving the instruction, and (3) whether the substance of the instruction is covered by other instructions. *Cliver v. State*, 666 N.E.2d 59, 66–67 (Ind.1996).

 First, Hagerman argues that the trial court erred in refusing the following tendered instruction:

> You are instructed that the Court has determined, as a matter of law, that it is undisputed that the hole through which Mr. Copeland fell was covered by Hagerman Construction Corporation approximately three to four weeks prior to the accident. The Court has also determined that Hagerman Construction Corporation employees covered the opening sufficiently with plywood approximately three to four weeks before the incident and have been unable to determine who may have removed the covering from the opening prior to Mr. Copeland's fall.

> This means these facts have been established as a matter of law for your deliberation.

(R. 3799). Hagerman based this proposed instruction on the trial court's July 14, 1994 grant of summary judgment in favor of Concrete Technology, Inc., both on Copeland's complaint and Hagerman's cross-claim. During trial, Hagerman requested that the trial court take judicial notice of three earlier orders, including the July 14 order. The court took judicial notice and allowed Hagerman to distribute to the jury redacted portions of the order, which included the portion quoted in the tendered instruction, above. The trial court stated to the jury that the court "has taken judicial notice of certain matters, which means that they're in evidence essentially, and I've asked the Bailiff to distribute those." (R. 6829). The trial court later gave Instruction No. 34 as follows: "The Court has taken judicial notice of prior Orders in this case. You shall accept the fact that these Orders were made as conclusively proved." (R. 3860).

Hagerman argues that because the July 14, 1994 order was the law of the case, the trial court was bound to give the tendered instruction which contained a portion of that order. Indiana Evidence Rule 201(g) states: "In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed." Hagerman contends that the trial court failed to comply with this rule when it refused the tendered instruction.

The trial court did not err in refusing Hagerman's proposed instruction. The jury was instructed to accept the July 14, 1994 order as conclusive and was provided copies of pertinent portions of that order. The trial court did not abuse its discretion in not instructing the jury in the precise manner desired by Hagerman.[12]

### VIII. *Sudden Emergency Instruction*

Hagerman next argues that the trial court erred when it gave an instruction on sudden emergency:

> When a person is confronted with a sudden emergency not of his own making without sufficient time to determine with certainty the best course to pursue, that person is not held to the same degree of judgment as would be required of him if he had time for deliberation. Accordingly, if the person exercises such care as an ordinarily prudent person would exercise when confronted with a similar emergency, he is not negligent.

> In this case, if you find from the evidence that Tony Copeland was confronted with sudden emergency and that he pur-

---

benefits by reason of employee's labor does not constitute direct payment).

**12.** Therefore, we need not address whether the evidence admitted at trial supported an instruc-

tion which was based on a *pre-trial* order, regardless of whether the order was the law of the case.

sued a course of action that an ordinarily prudent person would have pursued when confronted with the same or similar emergency, then you may not assess negligence to him.

(R. 3851). Hagerman asserts that when Anthony landed on the concrete beam after falling through the floor opening, his attempt to stand up or move across the beam was of his own making, and the instruction should not apply.

■ The instruction given by the trial court is a correct statement of the law. *See Stepanek v. Durbin*, 640 N.E.2d 429, 432 (Ind.Ct.App.1994), *trans. denied*. That the instruction is supported by the record we do not think can be seriously questioned. Anthony fell through a floor opening nearly forty-five feet above the ground and landed spread-eagle on a concrete beam some fifteen feet below. If this is not a sudden emergency, we are at a loss to know what one is. No other instruction covered this topic. The trial court did not abuse its discretion in instructing the jury on sudden emergency.

### IX. Sole Responsibility Instruction

Hagerman argues that the trial court erred when it gave Instruction No. 27:

> You are instructed that in a negligence case, a duty of care may arise by contract. The two (2) prime contracts state certain duties assumed by Hagerman and nonparty, Sater Electric, Inc. regarding safety. Hagerman and nonparty Sater owed these safety duties to each of their employees and to each employee of every one of their subcontractors. In this case, you are instructed that, as a matter of law, Hagerman owed all its contractually-assumed duties to Mr. Copeland on the date of the accident. You are further instructed that Hagerman was not relieved of any of these contractually-assumed safety duties by entering into a subcontract with Mr. Copeland's employer the John F. Beasley Co.

> In addition to their employees and the employees of their subcontractors, Hagerman and Sater owed their contractually-assumed safety duties to anyone else who may be affected by their work. *On the day of the accident, the hole through which Mr. Copeland fell was either solely the responsibility of Hagerman or also the responsibility of nonparty Sater*. You are further instructed that nonparty Sater also owed its contractually-assumed safety duties to Mr. Copeland if the hole through which Mr. Copeland fell was part of its work area on the day of the accident.

(R. 3852) (emphasis added). This instruction was based on the trial court's January 19, 1995 order granting Copeland's motion for partial summary judgment. That order determined that Hagerman owed a contractually-assumed safety duty to Anthony on the day of the accident. The trial court also denied Sater's motion for summary judgment in the same order:

> [T]he trier of fact could reasonably conclude that the hole through which Mr. Copeland fell was part of Sater's work under its prime contract on the day of the accident. If the trier of fact so concludes, Sater and Hagerman jointly owed their contractually-assumed safety duties to Mr. Copeland on the day of the accident.

(R. 2236). The trial court determined, as a matter of law, that Hagerman *definitely* owed Anthony a duty of safety, and that Sater *might* have owed Anthony a duty of safety, on the day of the accident. Therefore, as the only two prime contractors involved, either Sater and Hagerman jointly, or Hagerman alone, owed a duty to Anthony. This judgment was not appealed.

■ Hagerman argues that this jury instruction forbade the jury from finding Hagerman zero percent at fault. Fault, however, was not the subject of the instruction. Fault involves duty, breach and causation, while the instruction addressed only duty. Based on the trial court's January 19, 1995 order, the instruction which Hagerman challenges correctly states the law of the case. The addition of the word "solely" is a logical combination of the trial court's orders on partial summary judgment. The trial court did not abuse its discretion in giving this instruction.

### X. Indemnification Instruction

Hagerman's fourth challenge to the trial court's jury instructions concerns Instruction No. 33:

If you find for the Plaintiff and if you find that both Hagerman and Crown Corr were negligent, you may consider whether Hagerman is entitled to indemnification. You may find that Hagerman is entitled to indemnification only if you find that Hagerman is responsible for the negligence of Crown Corr. *If you find that the negligence of Hagerman and the negligence of Crown Corr are independent of one another,* you should find for Crown Corr on Hagerman's Cross–Claim for Indemnification.

(R. 3859). Hagerman argues that this instruction misstates the law.

The subcontract between Hagerman and Crown–Corr, based upon American Institute of Architects Document A401, 1987 edition, included the following indemnification clause, in pertinent part:

> To the fullest extent permitted by law, [Crown–Corr] shall indemnify and hold harmless [Hagerman] ... from and against claims, damages, losses and expenses ... arising out of or resulting from performance of [Crown–Corr's] Work under this Subcontract ... but only to the extent caused in whole or in part by negligent acts or omissions of [Crown–Corr] ... *regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder.*

(R. 7028) (emphasis added).[13] Hagerman contends that the instruction erroneously told the jury that indemnification: 1) was optional; 2) depended upon Hagerman being responsible for Crown–Corr's negligence, if any; and 3) depended upon Hagerman's and Crown–Corr's negligence being independent of each other.

■ We agree with Hagerman that the instruction was incorrect. While Hagerman was responsible contractually for the performance of its subcontractors, it is immaterial whether Hagerman is "responsible" for Crown–Corr's negligence. Because the word "responsible" as used here may imply a degree of fault, the instruction is confusing. More importantly, the indemnity clause of the contract does not require that Hagerman be found negligent, let alone negligent inde-

pendently from Crown–Corr. Crown–Corr's contract required it to indemnify Hagerman if Crown–Corr was negligent to any degree, even one percent, regardless whether Hagerman was also negligent, even ninety-nine percent. We conclude that the trial court abused its discretion in giving an erroneous jury instruction.

■ We also conclude, however, that this error was harmless. The jury found that Crown–Corr was zero percent at fault. Given this finding, there can be no indemnification where the loss was not caused even in part by any negligent act or omission of Crown–Corr. Hagerman asserts that because the jury first returned from deliberation without completing the verdict form for Hagerman's cross-claim for indemnification from Crown–Corr, that the jury must have been confused about this issue. We disagree. It is probable that the jury neglected to fill out the cross-claim verdict form because, finding Crown–Corr not at fault, it thought it unnecessary to do so.

### XI. Denial of Summary Judgment on Cross–Claim

Hagerman argues that the trial court erred in denying Hagerman's motion for summary judgment on its cross-claim for indemnity against Crown–Corr. Hagerman contends that indemnity is a matter of law for the court and should not have been submitted to the jury. Crown–Corr argues that the contract did not clearly and unequivocally require it to indemnify Hagerman for Hagerman's own negligence.

Upon review of the grant or denial of a summary judgment motion, we apply the same legal standard as the trial court: summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *North Snow Bay, Inc. v. Hamilton,* 657 N.E.2d 420, 422 (Ind.Ct.App.1995). The party appealing the trial court's grant or denial of summary judgment has the burden of persuading this court that the trial court's decision was erroneous. *Id.*

---

**13.** We note that this provision does not run afoul of Ind.Code § 26–3–5–1 in that it does not re-

quire that Crown–Corr indemnify Hagerman for Hagerman's sole negligence.

Whether a contract is ambiguous is a question of law for the court. *Indiana Erectors, Inc. v. Trustees of Indiana University,* 686 N.E.2d 878 (Ind.Ct.App.1997). This court will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties. *Hyperbaric Oxygen Therapy Systems, Inc. v. St. Joseph Medical Center of Ft. Wayne, Inc.,* 683 N.E.2d 243, 247–48 (Ind.Ct.App.1997), *trans. denied.* When the language of a written contract is not ambiguous, its meaning is a question of law for which summary judgment is particularly appropriate. *Id.* at 247.

Crown–Corr agrees that the contractual indemnification clause only provides for indemnification where the claims against Hagerman arise from Crown–Corr's performance of its work. Crown–Corr apparently claims that the contract is ambiguous concerning whether the parties intended to provide indemnity for Hagerman's own negligence. The contract provided that Crown–Corr must indemnify Hagerman "only to the extent caused in whole or in part by negligent acts or omissions of [Crown–Corr] ... regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder." (R. 7028). This provision appears to provide for indemnification for Hagerman's own negligence.

In its motion for summary judgment, Hagerman requested indemnification "to the extent the jury finds that Crown–Corr, Inc. is negligent." (R. 3128). The trial court denied the motion, finding that "genuine issues of material fact exist regarding delegation of duties and negligence." (R. 3397). It appears to us that regardless of how Hagerman delegated duties of safety to its subcontractors, and regardless of whether Hagerman was negligent, Crown–Corr was obligated to indemnify Hagerman if at least Crown–Corr was negligent. We need not decide this question, however. If the trial court erred in denying Hagerman's motion for summary judgment, it was harmless. The jury found that Crown–Corr was zero percent at fault for Anthony's accident; therefore Crown–Corr need not indemnify Hagerman. Hagerman contends that the trial court's failure confused the jury, evidenced by the jury's failure to initially return a verdict on indemnification. We disagree, as discussed above.

## XII. Denial of Motion for Set–Off

Following trial, Hagerman filed a motion for set-off, seeking a credit against the judgment for any amount received by Copeland in settlement with Sater. Evidence as to the amount of settlement was barred from discovery by the trial court's earlier order. Hagerman argues that the trial court erred in not crediting this settlement against the judgment. Copeland contends that because Sater was named a nonparty pursuant to Ind.Code § 34–4–33–10, this would result in a double credit.

Normally, where the actions of multiple defendants cause a single injury to a plaintiff, a defendant against whom judgment is rendered at trial is entitled to credit against the assessed damages in the amount of any funds received from any settling joint tort-feasor by the plaintiff. *Riehle v. Moore,* 601 N.E.2d 365, 371 (Ind.Ct.App.1992), *trans. denied.* This credit is allowed in order to prevent a plaintiff from recovering twice for the same injury. *Id.*

Copeland cites *Barber v. Cox Communication Inc.,* 629 N.E.2d 1253 (Ind.Ct.App.1994), *trans. denied,* for the proposition that Hagerman is "not entitled to a setoff precisely because that would produce a double credit." *Id.* at 1258. In *Barber,* however, the sums received by the plaintiff from the nonparty were received under a loan receipt agreement. "[F]unds advanced pursuant to a loan receipt agreement do not constitute partial payments nor satisfactions of judgment." *Manns v. Department of Highways,* 541 N.E.2d 929, 933 (Ind.1989). "[T]o the extent actually repayable from a judgment, loan receipt proceeds should not be subject to *pro tanto* credit against such judgment." *Id.*

We recently addressed the issue of crediting an amount received in settlement against a judgment awarded against a non-settling defendant. In *Mendenhall v. Skinner and Broadbent Co., Inc.,* 693 N.E.2d 611 (Ind.Ct.App.1998), *trans. pending,* we held that under the Comparative Fault Act, "a defendant may seek a credit for amounts paid by a settling joint tortfeasor as long as this does not result in a double credit." *Id.* at 613. In that case, the plaintiff and defendant were both found to be fifty percent at fault, but the settling party was not named a nonparty. The award against the defendant was re-

duced according to its percentage of fault, but was not reduced by any fault attributed to the settling party. Because the amount received by the plaintiff in settlement resulted in a double recovery for the same injury, we affirmed the credit allowed by the trial court.

■ We agree with Copeland that if the jury had found Sater at fault, the judgment would have been reduced by Sater's percentage of fault. Because Sater was a named nonparty, the amount of its settlement with Copeland, if Sater were at fault, could not then be credited against the judgment against Hagerman because this would result in a double credit against the already reduced judgment. The jury, however, found that Sater was zero percent at fault for the accident. The amount received by Copeland in settlement with Sater therefore resulted in a double recovery for the same injury. Allowing Hagerman a credit would thus "not result in a double credit." *Id.*

We conclude that the trial court erred in not granting Hagerman's motion for set-off. We remand this issue to the trial court to order discovery concerning the amount received by Copeland resulting from the settlement with Sater, and to then make a *pro tanto* adjustment to the amount of damages awarded by the jury by subtracting the settlement amount.

### XIII. Amount of Damages

■ Hagerman contends that the jury award is excessive. Appellate courts defer to jury latitude in making damage award determinations. *Kimberlin v. DeLong,* 637 N.E.2d 121, 129 (Ind.1994), *cert. denied,* 516 U.S. 829, 116 S.Ct. 98, 133 L.Ed.2d 53 (1995). "In order to justify us in reversing the judgment on such ground, the amount of damages assessed must appear to be so outrageous as to impress the court at 'first blush' with its enormity." *New York Central R.R. Co. v. Johnson,* 234 Ind. 457, 466, 127 N.E.2d 603, 608 (1955). A wrongful death verdict will be considered excessive only if it is so outrageous as to indicate passion, prejudice, or partiality rather than reasoned judgment. *Kimberlin,* 637 N.E.2d at 129.

Damages in a wrongful death action "shall be in such an amount as may be determined by the court or jury, including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earning of such deceased person." Ind.Code § 34–1–1–2. "Based on the language, 'including, but not limited to,' the statutory measure of damages has been construed to included personal human loss," including loss of care, love and affection. *FMC Corp. v. Brown,* 551 N.E.2d 444, 449 (Ind.1990). The compensation for pecuniary loss must be within the range of the evidence and reasonable inferences therefrom, that is, it must be rationally based. *Id.* at 450.

■ The jury was instructed that, if Hagerman was found liable to Copeland, Copeland was entitled to recover: 1) the value of necessary and reasonable funeral and burial expenses; 2) the value of Anthony's earning capacity and services; 3) the value of the loss of care, love and affection; and, 4) the value of the loss of parental training and guidance. The evidence showed that the present value of Copeland's monetary loss, including lost earning capacity, household services, and expenses totaled $1,526,199.00. The jury found that Copeland's total damages were $4,750,-000.00. The economic damages equal approximately 32 percent of the total award.

Our supreme court recently decided *FMC Corp. v. Brown,* a case similarly involving the death of a construction worker, survived by a spouse and two small children. In *FMC,* the court upheld a jury award of $2,900,000.00, which included economic damages of $919,-000.00. *Id.* at 451. The economic damages in that case equaled approximately 31.7 percent of the total award. The *FMC* decedent was twenty-eight years of age, had a life expectancy of 45.4 years and annual earnings of approximately $16,500.00. At the time of his death, Anthony was twenty-nine years of age, had a life expectancy of 44.7 years and annual earnings of approximately $16,500.00. At the time of his death, Anthony was twenty-nine years of age, had a life expectancy of 44.7 years and annual earnings of approximately $40,000.00. Considering the proportionality of these two cases, we cannot say that the jury verdict was excessive. The trial court did not err in refusing to reduce the amount of damages.

Affirmed in part and remanded in part.

HOFFMAN and STATON, JJ., concur.

## OPINION ON REHEARING

(October 6, 1998)

RATLIFF, Senior Judge.

In our previoulsy published ipinion in the case, *Hagerman v. Copeland,* No. 18A04–9612–CV–519 (Ind.Ct.App. June 25, 1998), we declined to address the issue of whether the trial court properly admitted evidence of subsequent remedial measures taken be Hagerman after Anthony Copeland's accident. We did not decide the issue because substantially the same evidence was contained on the deposition of William Tomich, a co-worker of Anthony's. Although the entire deposition was contained in the record as submitted by Hagerman, with some lines struck by the trial court, the portion we referred to was not actually read to the jury. We now address this issue on the merits.

Indiana Evidence Rule 407 specifically authorizes the admission of evidence of a subsequent remedial measure when offered for a purpose other than proving negligence. *Utley v. Healy,* 663 N.E.2d 229, 238 (Ind.Ct. App.1996), *trans. denied.* Such evidence is admissible to show the defendant's ownership or control of the premises when that issue is in genuine dispute. *Welch v. Railroad Crossing, Inc.,* 488 N.E.2d 383, 392 (Ind.Ct. App.1986).

The question of which entity had control over the opening through which Anthony fell was a principal issue in this litigation. This dispute was central to the trial court's order denying Sater Electric Co.'s motion for summary judgment. In that order, the trial court found that "[u]nder their separate prime contracts with BSU, Hagerman and Sater retained control over their respective portions of the work." (R. 2234). The trial court then concluded: "The work area surrounding the hole through which Mr. Copeland fell was either the contractual responsibility of Hagerman or of Sater on the day of the accident." (R. 2236). It was this "material question of fact that require[d] denial" of summary judgment for Sater. *Id.*

This question was no less contested at trial. During their opening statement, Hagerman alleged that Sater Electric "opened the holes, the holes were there's [sic]. Once the holes were covered, the holes belonged to Sater." (R. 4115).

The evidence indicating that Hagerman covered the openings after the accident was offered to show not only that Hagerman had control of the openings when they were cre-

ated, but also at the time of the accident. Because this evidence was relevant to issues other than negligence, it was properly admitted. The trial court did not err.

Petition for Rehearing granted to amend our opinion and denied in all other respects.

HOFFMAN, J., and STATON, J., concur.